# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MICAH ISHONE QUINN** #948357
      Petitioner

**Vs.**

**JOHN DAVIS**, Warden
      Respondent

U.S. DISTRICT #

U.S.D.J.

U.S.M.J.

**2:19-cv-120**
Gordon J. Quist - U.S. District Judge
Maarten Vermaat - U.S. Magistrate Judge

_____/

BILL SCHUTTE
ATTORNEY GENERAL
525 WEST OTTAWA STREET, 7th FLOOR
PO BOX: 30212
LANSING, MICHIGAN

MICAH ISHONE QUINN #948357
IONIA CORRECTIONAL FACILITY
1576 W. BLUEWATER HIGHWAY
IONIA, MICHIGAN 48846

_____

## DECLARATION OF SERVICE

## MEMORANDUM OF LAW SUPPORTING
### HABEAS CORPUS RELIEF BASED

**By:**   MICAH ISHONE QUINN #948357
        **In Pro Se**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................. iii

JURISDICTIONAL STATEMENT ...................................................................... vii

QUESTIONS PRESENTED ................................................................................ viii

STATEMENT OF FACTS .................................................................................... 1

STANDARD OF REVIEW .................................................................................. 17

FEDERALIZATION ............................................................................................ 19

ACTUAL INNOCENCE ANALYSIS ................................................................. 19

## GROUNDS FOR GRANTING RELIEF

### GROUND ONE

THE PETITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BY PETITIONER'S IDENTIFICATION BY THE COMPLAINING WITNESS COURT AFTER THE COMPLAINT VIEWED MR. QUINN'S PICTURE IN THE PAPER IDENTIFYING HIM AS A PERSON ARRESTED IN CONNECTION WITH THIS CASE.........................................................................21
**STANDARD OF REVIEW** ............................................................................... 21
**LEGAL SYNOPSIS** ........................................................................................ 21

### GROUND TWO

THE PETITIONER IS ENTITLED TO A NEW TRIAL AS HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.................................................................................24
**STANDARD OF REVIEW** ............................................................................... 25
**LEGAL SYNOPSIS** ........................................................................................ 25

### GROUND THREE

THE PETITIONER IS ENTITLED TO BE RESENTENCED BECAUSE THE FACTS IN SUPPORT OF SOME OF HIS OFFENSE VARIABLE SCORES WERE NOT FOUND BY THE JURY TO BE PROVEN BEYOND A REASONABLE DOUBT, HE WAS SENTENCED PRIOR TO JULY 29, 2015, AND THE SIXTH AMENDMENT VIOLATION ALTERED THE GUIDELINE RANGE.......28

**STANDARD OF REVIEW** ..................................................................................................28

**LEGAL SYNOPSIS** .......................................................................................................28

**RELIEF SOUGHT** .......................................................................................................31

**DECLARATION OF SERVICE** .....................................................................................31

# INDEX OF AUTHORITIES

## SUPREME COURT CASES

Alleyne v United States 570 US 99; 133 SC 2151 (2013) ........................................28

Bousley v United States 523 US 614; 622 118 SC 1604 (1998) ...............................20

Calderon v Thompson 523 US 538; 118 SC 1489 (1998) .........................................20

Coleman v Thompson 501 US 722, 750; 111 SC 2546 (1991) .................................20

Harrington v Richter 562 US 86, 101; 131 SC 770 (2011) ......................................17

Herrera v Collins 506 US 390; 113 SC 853 (1993)...................................................19

House v Bell 547 US 518; 126 SC 2064 (2006).......................................................20

In re Winship 397 US 358; 90 SC 1068 (1970).........................................................28

Jackson v Virginia 443 US 307; 99 SC 2781 (1979).................................................18

Keeney v Tamayo-Reyes 504 US 1; 112 SC 1715 (1992) .........................................20

Kuhlmann v Wilson 477 US 436; 106 SC 2616 (1986) ............................................20

Lindh v Murphy 521 US 320; 117 SC 2059 (1997) ..................................................17

Lockyer v Andrade 538 US 63; 123 SC 1166 (2003) ...............................................18

Lutwak v United States 344 US 604; 73 SC 481 (1953) ..........................................18

McCleskey v Zant 499 US 467; 111 SC 1454 (1991) ...............................................20

Miller-El v Cockrell 537 US 322; 123 SC 1029 (2003) ...........................................17

Miranda v Arizona 384 US 436; 86 SC 1602 (1966) ...............................................26

Murray v Carrier 477 US 478; 106 SC 2639 (1986) ................................................19

Powell v Alabama, 287 US 45; 53 SC 55 (1932) .....................................................25

Renico v Lett 559 US 766; 130 SC 1855 (2010).......................................................17

Sawyer v Whitley 505 US 333; 112 SC 2514 (1992).................................................19

Simmons v United States 390 US 377; 88 SC 967 (1968) ........................................22

Stovall v Denno 388 US 293; 87 SC 1967 (1967)..................................................22

Strickland v Washington 466 US 668; 104 SC 2052 (1984)..................................25

Townsend v Burke 334 US 736; 68 SC 1252 (1948) ............................................28

United States v Cronic 466 US 648; 104 SC 2039 (1984) ...................................25

United States v Gaudin 515 US 506; 115 SC 2310 (1995) ..................................28

Von Moltke v Gillies 332 US 708; 68 SC 316 (1948) .........................................27

Wetzel v Lambert 565 US 520; 132 SC 1195, 1199 (2012)..................................18

Williams v Taylor 529 US 362; 120 SC 1495 (2000) ..........................................17

Wong Sun v United States 371 US 471; 83 SC 407 (1963) .................................22

Woodford v Visciotti 537 US 19; 123 SC 357 (2002) .........................................17

Yarborough v Alvarado 541 US 652; 124 SC 2140 (2004) .................................17

**FEDERAL CASES**

Blackburn v Foltz 828 F2d 1177 (6th Cir 1987) ..................................................27

Franklin v Rose 811 F2d 322 (6th Cir 1987)........................................................19

**STATE CASES**

People v Anderson 29 Mich App 578 (1971)....................................................21, 22

People v Bryant 491 Mich 575, 595 (2012) .........................................................28

People v Childers 20 Mich App 639 (1969)....................................................22, 25

People v Cicotte 133 Mich App 630 (1984) .........................................................27

People v Cipriano, 431 Mich 315 (1988) .............................................................26

People v Davis 102 Mich App 403 (1980) ...........................................................27

People v Elliott 494 Mich 292 (2013) ..................................................................26

People v Erb 48 Mich App 622 (1973)..................................................................27

People v Grant 470 Mich 477 (2004) ................................................................................................24, 25

People v Houstina 216 Mich App 70 (1996) .................................................................................21

People v Hutton 21 Mich App 312 (1970) ....................................................................................22

People v Johnson 124 Mich App 80 lv den 419 Mich 851 (1983) ...............................................27

People v Kachar 400 Mich 78 (1977) ...........................................................................................21

People v Kimble, 470 Mich 305 (2004) ........................................................................................28

People v LeBlanc 465 Mich 575 (2002) .......................................................................................24

People v Likine 492 Mich 367 (2012) ..........................................................................................28

People v Limon 4 Mich App 440 (1966) ......................................................................................21

People v Lockridge 498 Mich 358 (2015) ............................................................................. Passim

People v Loudenslager 327 Mich 718 (1950)...............................................................................27

People v Martin 37 Mich App 621 (1972).................................................................................22, 26

People v McGraw 484 Mich 120 (2009) ......................................................................................28

People v Pickens 446 Mich 298 (1994).........................................................................................25

People v Pubrat 451 Mich 589 (1996)...........................................................................................25

People v Solomon 391 Mich 767 (1974)........................................................................................22

People v Stokes 312 Mich App 181 (2015)....................................................................................28

People v Terrell 312 Mich App 450 (2015)....................................................................................28

People v Virgil Brown 15 Mich App 600 (1969) ..........................................................................27

People v Walker 374 Mich 331 (1965)..........................................................................................26

## STATUTES

28 USC §2254..........................................................................................................................16, 18

MCLA 769.34(10) ..........................................................................................................................28

MCLA 777.33 ............................................................................................................................29, 30

MCLA 777.34 .................................................................................................................29, 30

MCLA 777.40 .................................................................................................................29, 30

MCLA 777.43 .................................................................................................................29, 30

MCLA 777.46 ......................................................................................................................30

**RULES**

MCR 6.429(C) ......................................................................................................................28

**CONSTITUTIONAL PROVISIONS**

Mich. Const. of 1963 Art-1 §17 ...........................................................................................21

Mich. Const. of 1963 Art-1 §20 ....................................................................................25, 28

US Const. Amendment V .....................................................................................................21

US Const. Amendment VI ...................................................................................................28

US Const. Amendments XIV ...............................................................................................25

## JURISDICTIONAL STATEMENT

The Petitioner, Micah Ishone Quinn appeals as of right pursuant to MCR 7.203(A) the January 21, 2015 Order of the Muskegon County Circuit Court which committed him to prison pursuant to MCLA 750.529, MCLA 750.349b, and MCLA 750.227b. The time to file this Brief was extended until October 30, 2015 by Order of this Court. The Petitioner's appeal centers on the lower court's suggestive identification procedure, ineffective assistance of counsel failure to file several motion, and failure to call alibi witnesses, and to resentencing under *People v Lockridge 498 Mich 358 (2015)*. The Michigan Court Appeals denied his Direct Appeal on July 14, 2016 in COA: #326738. See *People v Quinn 2016 Mich App Lexis 1343*. The Michigan Supreme Court denied him leave to appeal May 1, 2018 in the *People v Quinn 2018 Mich Lexis 829* in MSC: #157014 on the grounds they were not persuaded that the questions presented should be reviewed by their Court. The Petitioner did not seek a Writ of Certiorari to the United States Supreme Court but select to file this Wirt of Habeas Corpus currently before this court.

## QUESTIONS PRESENTED

**QUESTION ONE**

> WHETHER PEITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BY HIS
> IDENTIFICATION BY THE COMPLAINING WITNESS IN COURT, AFTER THE
> COMPLAINANT VIEWED MR. QUINN'S PICTURE IN THE PAPER, IDENTIFYING HIM
> AS A PERSON ARRESTED IN CONNECTION WITH THIS CASE, AND AFTER THE OIC
> TOLD THE COMPLAINANT THE PEOPLE ARRESTED MADE ADMISSIONS ?

The State's Answer is "No"

The Petitioner's Answer is "Yes"

**QUESTION TWO**

> WHETHER PEITIONER IS ENTITLED TO A NEW TRIAL AS HE WAS DENIED
> EFFECTIVE ASSISTANCE OF COUNSEL?

The State's Answer is "No"

The Petitioner's Answer is "Yes"

**QUESTION THREE**

> WHETHER PEITIONER IS ENTITLED TO BE RESENTENCED BECAUSE THE FACTS
> IN SUPPORT OF SOME OF HIS OFFENSE VARIABLE SCORES WERE NOT FOUND BY
> THE JURY TO BE PROVEN BEYOND A REASONABLE DOUBT, HE WAS SENTENCED
> PRIOR To JULY 29, 2015, AND THE SIXTH AMENDMENT VIOLATION ALTERED THE
> GUIDELINE RANGE?

The State's Answer is "No"

The Petitioner's Answer is "Yes"

## STATEMENT OF FACTS

At the April 30, 2014 Preliminary Hearing before the Hon. Michael J. Nolan, Defendant-Appellant is present with counsel, Mr. West? for preliminary hearing on two cases. The charges for the first case were Armed Robbery, Unlawful Imprisonment, and two counts of Felony Firearm. (T 4-30-2014, p 2).

**Roy Ferguson** was working as a delivery driver for Domino's Pizza on March 19, 2014. He was delivering a pizza to 1723 Elwood, Muskegon, Michigan, when two men hurried across the road and stuck a gun in his back as he knocked on the door. The men instructed him to put the stuff on the ground and walk with them, which he did. The two men walked him to the back of his car. He identifies Mr. Quinn as one of the two men. There were two guns and Mr. Quinn had one of them. (T 4-30-2014, p 5-6). The witness was told to get in the trunk, which he did. The men got in the car and drove away. After about 15 minutes the car stopped. The men had the witness get out of the trunk and strip down to his underwear. The men took the clothes but later the witness found his shoes in the car. They were still armed and had him get back in the trunk. Then they drove between half an hour and an hour. They had him get out again, kneel down and pray. One of them pulled the trigger of the gun but it just clicked and they said "ha ha got you." (T 4-30-2014, p 7-8). The witness was ordered back in the trunk. They drove 10 to 15 minutes, then opened the trunk again. They told the witness to count to 100, then get out of the trunk. The witness complied, and the men were gone when he got out. The witness went to look for his clothes, and to see if the car was unlocked. The car was unlocked. he found his shoes, put them on, and began walking. The men had taken the car keys. Additionally the men took a radio, a cell phone, the witness' belt, pants and Dominos jacket. (T 4-30-2014, p 9-10).

The witness sustained some injuries. After the men pretended to shoot the witness, one of them hit the witness in the jaw with the butt of the gun. Someone hit him in the teeth. Mr. Quinn was not the man who pulled the trigger on the gun. (T 4-30-2014, p 10).

The man who pulled the trigger was holding a black handgun. The other man had a silver revolver. The witness had not seen either man before. (T 4-30-2014, p 11-13). The witness looked at the man with the silver gun for about 10 seconds. (T 4-30-2014, p 16). The guy with the silver gun was the one always telling the witness what to do and when to do it. At some point both of them were hitting and kicking him. (T 4-30-2014, p 17).

The incident happened at night, on Tuesday, going into Wednesday. The witness viewed a photo lineup on Friday, at his apartment. Detective Borterenbrood was one of the officers. The witness was not able to identify anyone. (T 4-30-2014, p 18-20). Both of the men wore hoodies so it was hard to see them. (T 4-30-2014, p 21).

The witness could not see the hair of the man with the silver gun, Mr. Quinn. The witness got a good look at him in his peripheral vision when they were by the house. He looked at him for a brief time, then looked away when he was ordered not to look at him. That was the last time the witness looked at Mr. Quinn. (T 4-30-2014, p 23-25). The witness was told that there were two confessions in the case, after he looked at the six pack, but prior to the Preliminary exam. The Court sustained the Prosecutor's objection to Defense Counsel's inquiry as to whether the witness thought the confessions were by the two Defendants charged in this case. (T 4-30-2014, p 27-29). On questioning by the Court, the witness did not have any trouble in identifying Mr. Quinn after he saw him in the newspaper and a news report. (T 4-30-2014, p 30). The article in the newspaper discussed the charges and the confessions, and showed pictures of the men. The witness acknowledges that the newspaper article and picture helped him remember Mr. Quinn, although he had a better look at the other man. When he looked at the paper, he knew that the two people pictured there would have had to be the guys who did it. The Court sustains the Prosecutor's objection to the question "Do you agree without that information you may not have been able to identify my client?" (T 4-30-2014, p 30-32).

**Detective Peter Broterenbrood**, of the city of Muskegon Police Department, was involved in investigating the robbery of Mr. Ferguson. Mr. Quinn was not in the six pack he presented to Mr. Ferguson. The witness interview Mr. Quinn, and advised him of his Miranda rights, which he waived. (T 4-30-2014, p 36-37).

On voir dire regarding the Miranda rights, the interview was on March 27 at around 3 o'clock in the afternoon. The witness took Mr. Quinn into custody outside of 1538 Hoyt Street, but did not transport him to the Police Department, a uniformed officer did that. The witness had not yet obtained the search warrant. Mr. Quinn was not read his Miranda rights at the scene. He was only asked basic questions, to determine he was the person they were looking for at that time. The information given to the witness was that Mr. Quinn was transported to the Muskegon Police Department, and placed in an interview room where he remained until the witness arrived one or two hours later. An officer was posted outside the door, and there is a closed-circuit TV system, with both audio and video of the room. When the witness arrived back at the police department, he turned the closed-circuit TV system on and began the interview process. The entire interview was preserved. No initial statement was taken prior to the recording. After the witness read the Miranda rights, Mr. Quinn indicated that he wished to speak. Mr. Quinn was told, sometime during the interview process, that guns were found at 1538 Hoyt. The witness denies that Mr. Quinn ever said that he did not want to talk, or that he wanted a lawyer. The interview room was a small room, and both detectives moved closer to Mr. Quinn at some point. When asked if he did anything to persuade Mr. Quinn to talk, the witness responds that "Persuade's a fairly strong word." (T 4-30-2014, p 38-47).

On continued direct, the witness testified that Mr. Quinn admitted that he and the codefendant ordered some pizza, took part in the armed robbery. He indicated he had a silver pistol. The witness informed the complainant that Mr. Quinn had been arrested, and had confessed. (T 4-30-2014, p 48-49).

3

The witness told the complainant, Mr. Ferguson, that two people had been arrested, and had admitted to the crimes. Another officer was also sent over to make contact with Mr. Quinn in the jail, after arraignment. The witness informed his Sergeant that the police could not speak with Mr. Quinn regarding the robbery because he had been arraigned. (T 4-30-2014, p 50-51).

Defense Counsel objected to bind over without argument, and presented a stip and order allowing him to withdraw as Counsel on both cases, as he had only been hired through the prelim. The Court bound Mr. Quinn over as charged. (T 4-30-2014, p 52).

At the September 26, 2014 Plea Hearing before the Hon. William C. Marietti, Defendant-Appellant is present with counsel, Mr. Marek, There is a Cobbs evaluation of 21 years plus two, which is only good through the date of this hearing. Mr. Quinn did not wish to enter a plea. (T 926-2014, p 3-4).

At the September 30, 2014 Jury Trial before the Hon. William C. Marietti, Defendant-Appellant is present with counsel, Mr. Marek. Mr. Quinn did not want to proceed with Mr. Quinn, and wanted to represent himself. After some discussion with the Court, and a brief adjournment for Mr. Quinn to discuss the matter with his family, Mr. Quinn withdrew his motion to represent himself. (T 9-30-2014, p 3-8). The Prosecutor had an amended Information. Additionally, the Prosecutor was asking for a witness detainer for Brian Scott, an MR.-E 404(b) witness. (T 9-30-2014, p 9-10). The parties conducted voir dire and selected a jury. (T 9-30-2014, p 10-78).

After the lunch break, Mr. Quinn's Counsel announced that Mr. Quinn wanted to take advantage of the Cobbs evaluation, and enter a plea. Mr. Quinn was sworn, and entered a no contest plea. The Court accepted the plea. (T 9-30-2014, p 84-96).

On November 4, 2014, Defendant-Appellant is present with counsel, Mr. Marek, for sentencing. Mr. Quinn wished to withdraw his plea, and requested new counsel. The Prosecutor waived notice. (T 11-4-2014, p 2). Mr. Quinn asserted that he was not guilty, and wishes to proceed to trial. (T 11-4-

4

2014, p 8). Mr. Quinn asserted that he was high when he told the police he committed this crime, and that he was covering for someone else. Mr. Glenn and Mr. Kurt told him what happened during the robbery. (T 11-4-2014, p 9). The Court granted the motion to withdraw the plea. (T 11-4-2014, p 10). The Court agreed to provide Mr. Quinn with a different Court-appointed attorney. (T 11-4-2014, p 12-13).

At the January 20, 2015 Jury Trial before the Hon. William C. Marietti, Defendant-Appellant is present with counsel, Mr. Lesica. (T 1-20-2015, p 3). The jury panel is sworn. After preliminary instructions and introductions, the parties conduct voir dire and select a jury. (T 1-202015, p 3-51). The jury is given some additional instructions and excused for lunch. (T 1-20-2015, p 51-57).

Following the break, the Court ordered witnesses sequestered, and granted the Prosecutor's request for a witness detainer for Brian Scott. (T 1-20-2015, p 57). The jury returns to the courtroom and is sworn, and given more instructions. (T 1-20-2015, p 58-67). The Prosecutor and Defense Counsel give opening statements. (T 1-20-2015, p 68-72; 72-74).

**Roy Ferguson** had been employed for 18 years at Domino's Pizza on Apple Avenue as a delivery driver on March 19, 2014. On that day he was delivering pizzas to 1723 Elwood, in Muskegon. He arrived at the address at about 11: 15 p.m., got out of his vehicle and approached the house. A couple men followed him to the door, and one of them stuck a gun in his back, and the other stood a few feet away, also with the gun. (T 1-20-2015, p 74-76). The witness felt the gun, and could also see it in his peripheral vision. Although he was told not to knock on the door, he had already done so. The witness identifies Mr. Quinn as the man who placed the gun in his back. (T 1-20-2015, p 77-78). The person with the gun in his back did all of the talking, and ordered him to go back to the car. By the car, the witness was ordered to put the food on the ground, and empty out his pockets. The witness took $20, his cell phone and the keys to his car from his pockets. Mr. Quinn took the money

**5**

and wallet from the witness. The witness was then ordered into the trunk of the car, and then the men drove for about 20 minutes. (T 1-20-2015, p 78-82).

After 20 minutes, the car stopped and the witness was ordered out of the trunk. He was told to strip down to his underwear by Mr. Quinn, then ordered back into the trunk. They drove around again, making a couple stops, then stopped and got the witness out of the trunk again. He was told to pray, he is pretty sure it was Mr. Quinn who said that. Then the other man put his gun against the witness' head and pulled the trigger. The gun clicked, and Mr. Quinn laughed and said "gotcha". Then one of them hit the witness in the jaw with the gun. He believes that was Mr. Quinn because it was a silver gun. He was knocked to the ground and then one of them hit him. He was also kicked three times, but he does not know which one kicked him. (T 1-20-2015, p 8387).

When the witness was at the house to deliver pizzas, the area was fairly well lit. He was able to see the men's faces, and that's how he is able to identify Mr. Quinn in court today. (T 1-202015, p 88).

The witness could not see who was hitting and kicking him while he was on the ground. He finally yelled, then Mr. Quinn told him to hun•y up and get back in the frunk. They drove around some more, and asked the witness if he was okay. They stopped, came back to the trunk, unlocked it, and told the witness to count to 100 then get out of the trunk. The witness counted to 100, then got out of the ü-unk and they had disappeared. He looked for his clothes, but only found his shoes in the car, and put them on. The witness recognized the area, and walked to a gas station. He told the attendant that he had been beaten up, robbed and stuffed in his trunk. The attendant called 911. About five minutes later an officer showed up and took his report. After that he was transported to the hospital. (T 1-20-2015, p 89-91).

At the hospital, the witness learned he had a broken nose, a black eye, and broken teeth. He believes the ordeal took an hour and a half. Exhibit 1 is a picture of the house where he was delivering the pizza. Exhibit 3, a photograph of the other individual who was with Mr. Quinn, is admitted over

**6**

objection of Defense Counsel. Exhibit 4 and 5 are photographs of the car. Exhibit 6 is a photograph of the witness taken at the hospital. (T 1-20-2015, p 92-97).

The witness saw a black gun and a silver gun that night. Defense Counsel objects to the witness identifying photographs of the gun because there was no DNA and no fingerprints taken from those guns, and the witness indicated he could not see the entire gun. The Court overrules the objection, and the witness indicates that the silver gun in Exhibit 7 looks familiar, but the black one does not. Exhibit 7 was admitted as demonstrative evidence only. (T 1-20-2015, p 98-100).

The witness did not know Mr. Quinn or the other individual prior to that date, and had never had any negative encounters or anything like that with either of them. The witness looks Mr. Quinn up-and-down pretty good when he was setting the food down, and before he got into the trunk. He also saw Mr. Quinn at the door, "but not that good at that point." (T 1-20-2015, p 100-101).

On cross, the witness was put in the trunk pretty fast. Both men were wearing hoodies that were pulled up to cover their faces, although they were not pulled tight. He associates the silver gun with Mr. Quinn, and does not believe that the men switched guns. He does not claim that the guns in the Prosecutor's picture are the guns that were involved. At the door he just saw Mr. Quinn out of his peripheral vision. (T 1-20-2015, p 102-105). The witness got his best look at both men when he was emptied his pockets. Just before he got the trunk he was told not to look at them. At that point he had just looked at them for a couple seconds. He never looked at Mr. Quinn's face again. (T 1-20-2015, p 106-108).

At one point the witness was shown a photo lineup. He did not identify anyone in that time. Prior to the preliminary examination he saw a newspaper story, with photographs of Mr. Quinn and the other person. The witness acknowledges that he saw Mr. Quinn in the newspaper. Prior to that he didn't remember exactly what he looked like, but as soon as he saw the picture, and as soon as he saw him in court, he recognized him. The witness denies that the picture influenced his identification. (T

1-20-2015, p 109-112). Mr. Quinn is not the person who put the gun to the witness's head and clicked it. (T 1-20-2015, p 113).

Mr. Quinn and the other person appeared to be working together. Mr. Quinn only gave the witness orders, he did not give the other person any orders. When he viewed the six pack, the witness thought that one of the people looked similar to the other man who was with Mr. Quinn. Exhibit 8 is the six pack. Neither of the men are pictured there. (T 1-20-2015, p 116-119). The witness does not remember if the police gave him the opportunity to identify Mr. Quinn in another lineup. (T 1-20-2015, p 120-121).

The witness does not deny that he saw Mr. Quinn and the other man's picture in the paper prior to identifying him at the preliminary exam. (T 1-20-2015, p 121-122).

**Charles Anderson**, of the Muskegon Police Department, responded to a missing person call on March 19, 2014. The call was placed by Domino's, looking for Mr. Ferguson. While the witness was at Domino's, dispatch called and said that Mr. Ferguson had called 911. The witness responded to the location, and found Mr. Ferguson inside the gas station. He was upset, and bleeding from his mouth and nose. He was holding his stomach, and had no pants on. The witness did not have much time to interview Mr. Ferguson because the ambulance was almost there. He said that he had been robbed at gunpoint by two black males, and put in his trunk. He gave the witness a description, and the location Of his vehicle. The witness was able to locate the vehicle. The vehicle was unlocked, and the trunk was ajar. Exhibit 9 is a photograph of the vehicle. (T 120-2015, p 125-128).

Later the witness went to Hackley Hospital to see Mr. Ferguson and take a statement. Mr. Ferguson was still very upset. Mr. Ferguson said he went to 1723 Elwood and knocked on the door. S omebody came up and put something in his back. He said it felt like a handgun but didn't see it at that point. He turned around, and there were two black males, both with handguns, they took him back to the road and told him to put his pizza on the curb to get into the trunk of his vehicle. They closed the

**8**

tillilk, then drove the car around for about 15 minutes. They stopped the car near some industrial building and told him to give them his pants and shoes, then put him back in the trunk, shut the trunk and rode around for another 15 minutes. They stopped again by some woods, had him get out of the trunk and one of them asked if they should take him to the river. He said no, and at that time he was struck. He was hit with the butt of the gun twice, and kicked when he was on the ground. One of the suspects aimed his pistol at him, pulled the trigger and it clicked but didn't go off. They put him in the trunk again and drove around for half an hour, then pulled over and told him to count to 100 before he got out of the trunk. Mr. Ferguson did as he was told, then made his way to the gas station and someone called 911. (T 1-20-2015, p 128-132).

The witness and another officer went to 1723 Elwood. The porch light was on, but nobody was home. When they walked by the curb, there was a two liter of 7-Up, which looked fresh, so the witness preserved it for evidence, as seen in Exhibit 10. (T 1-20-2015, p 133-134).

Mr. Ferguson told the witness that he could identify the two men, but the witness did not pursue it because he did not have any suspects. (T 1-20-2015, p 143). The jury is excused for the day. (T 1-20-2015, p 135).

At the January 21, 2015 continued Jury Trial before Judge Marietti, Defendant-Appellant is present with counsel, Mr. Lesica. (T 1-21-2015, p 1).

**James Patrick Walsh**, a special agent with the ATF, was assigned to assist the Muskegon Police Department in an armed robbery investigation on March 27, 2014. As part of that investigation he went to 1538 Hoyt Street in Muskegon. He and several other officers were in his vehicle conducting surveillance of the front of residence, and there were vehicles watching the back as well. They secured the residence until a state search warrant could be obtained. The witness participated in execution of that warrant. (T 1-21-2015, p 3-5). Exhibit 11 is a photograph of the residence. In one of the back bedrooms he found a metal box in an air duct vent. Exhibits 12 and 13 are photographs of the air duct

9

vent, Exhibit 13 also showing the box.  (T 1-21-2015, p 69).  The witness discovered two firearms in the box, which are depicted in Exhibit 7.  Exhibit 14 is a photograph of the box and some loose ammunition.  (T 1-21-2015, p 9-12).

Exhibit 15 is a Smith and Wesson .22 caliber revolver, one of the firearms found in the box. Exhibit 16 is the other firearm, a Smith and Wesson .38 caliber revolver.  (T 1-21-2015, p 12-14).  He recovered the guns, he is not saying they were used in the robbery. (T 1-21-2015, p 15-16).

**Peter Boterenbrood**, of the Muskegon Police Department, was the lead detective, assigned the morning following the robbery.  He discovered that a certain phone number was used to order the pizza, and backtracked to figure out whose phone it was.  The number traced back to Brian Scott.  Once the witness received that information, he located a subject named Brian Scott, and was looking at Mr. Scott is a potential suspect, but learned that his phone was missing.  It had been stolen in an armed robbery that occurred at McCrae field in the city of Muskegon, a week prior to the pizza robbery.  Then the witness began working on that robbery.  There was one number that showed up in Mr. Scott's records after his phone had been stolen, so the witness obtained the records for that phone, which was registered to Michael Quinn.  After that they began to "ping" that other phone number, to fry to locate it.  (T 1-21-2015, p 19-25).

During the interview with Mr. Scott, the witness learned that there was a drug transaction that was supposed to occur, and that Mr. Scott knew one of the individuals, and identified that person as Micah Quinn.  That was done through a photo lineup.  The "ping" technology led the witness to 1538 Hoyt.  They set up surveillance of the location, and another detective identified Micah Quinn as inside or around that home.  After he left the home, Mr. Quinn was stopped and identified by the other detective, as well as by the witness.  (T 1-21-2015, p 25-29).  The search warrant was executed later that same day.  The witness was present shortly after Mr. Quinn was taken into custody.  After the

search warrant was executed, the witness returned to the Police Department to interview Mr. Quinn. The witness conducted that interview along with Detective Kory Luker. (T 1-21-2015, p 29-30).

Mr. Quinn was given Miranda warnings. The witness began to interview Mr. Quinn regarding the pizza robbery, when Mr. Quinn made admissions to being involved in an earlier robbery, with Mr. Scott being the victim. Defense Counsel objected to testimony regarding a different robbery. The Prosecutor argued that it was admissible under MRE 404th). Defense Counsel notes that this witness was not listed as an MRE 404th) witness, and the Prosecutor begins to argue the content of the statement. The Court excused the jury. (T 1-21-2015, p 31-32).

Outside the presence of the jury, Defense Counsel notes that at a preliminary hearing Brian Scott testified, and did not identify Mr. Quinn, so the hearsay being offered is contrary to Mr. Scott's statement under oath. (T 1-21-2015, p 34). The Court ruled that Brian Scott's out-of-court identification of Mr. Quinn is not admissible for the truth of the matter asserted pursuant to MRE 801(D)(1)(c), but that the Prosecutor could-question the detective about the content of Mr. Quinn's statement, as that statement would be played for the jury and they could make up their own mind whether the detective's summary was correct. (T 1-21-2015, p 36-38).

The jury returned, and the Court instructed them that the detective's statement that Brian Scott identified Defendant as the person who robbed Brian Scott could not be considered as proof that the Defendant robbed Brian Scott or that Brian Scott identified Defendant as a person who robbed him. It can only be considered to explain why the detective, after having that information, took the next step he did. (T 1-21-2015, p 38-39).

On continued direct, the witness testified to Mr. Quinn's statement regarding the robbery at McCrae field, the identity of the codefendant as Taylin Glenn, and that one of them took a cell phone during that robbery. The interview was recorded. (T 1-21-2015, p 39-41). In the interview Mr. Quinn also explained that he and Mr. Glenn set up the pizza delivery robbery. They agreed they would call

**11**

Domino's, have some items delivered, and upon arrival of Mr. Ferguson, they robbed him at gunpoint, placed him in the trunk and drove around. They let him out of the trunk, removed his clothing, placed him back in the trunk and drove around again. At some point he was let out of the frunk again and beaten. He was put back in the trunk again and shortly thereafter was released. (T 1-21-2015, p 41-42). Initially, Mr. Quinn said he didn't know anything about the guns found at the residence on Hoyt. Eventually he told they witness the guns were used in the robbery. (T 1-21-2015, p 42-43). During the interview, the witness asked Mr. Quinn if he would like to write a letter to Mr. Ferguson, Exhibit 17 is the letter. The witness reads the letter, an apology to Mr. Ferguson, into the record. (T 1-21-2015, p 43-44).

Exhibit 18, a flash drive containing the recording of the interview is admitted and played for the jury. Although the Court indicates that the interview will be transcribed as part of the record, it is not. The recording is played, then the jury is excused for lunch. After the break the balance of the recording is played but not transcribed. (T 1-21-2015, p 45-50).

The witness only showed Mr. Ferguson one photo lineup. Prior to the preliminary exam, the witness contacted Mr. Ferguson and notified him that two people were in custody. After the witness interviewed Mr. Quinn, he was lodged at the jail. (T 1-21-2015, p 50).

When Mr. Quinn was arrested outside the residence on Hoyt Street, the witness only asked him a few identifying questions, nothing to do with either case. During the interview, Mr. Quinn did not appear to be high. The interview that the jury heard accurately reflected what actually happened, the gaps and pauses were when the officers were taking notes and writing stuff down. The officers did most of the talking, and a lot of repeating. The officer denied making any promises, but indicated they tried to lighten the mood. If any of the conversation was not recorded, the witness asserts that it would've been just basic information like Mr. Quinn's name address and date of birth. On the tape Mr. Quinn said he only knew Kwan a couple of months. (T 1-21-2015, p 51-55).

**12**

To the witnesses knowledge, there were absolutely no shots fired during this incident. No bullets were found in the chambers of the guns.  (T 1-21-2015, p 56).

The witness believes that somebody from the Detective Bureau would have been watching Mr. Quinn when he wrote out a statement.  The other officer suggested that Mr. Quinn write a letter of apology.  The witness is not sure if Mr. Quinn actually printed or wrote it out, but signed it. Mr. Quinn did not appear exhausted during the interview.  It took part two different times, the second time would've been in the evening, but not too late.  (T 1-21-2015, p 57-58).

On redirect, in the video Mr. Quinn provided information that the witness had not told him, although the witness did have the information that the other robbery involved a knife and a gun prior to the interview.  The Prosecutor asked the witness if Mr. Quinn told him that he committed the robbery because he was money hungry, and the witness replied that Mr. Quinn told him that he didn't have any money, and he was hungry.  (T 1-21-2015, p 59-62).

**Kory Luker**, a detective with the Muskegon Police Department, stopped Mr. Quinn when he left the house on Hoyt, and identifies Mr. Quinn for the record.  He also participated in the interview of Mr. Quinn.  (T 1-21-2015, p 64-67).

The Prosecutor placed a stipulation on the record that Detective Matt Kolkema, while performing surveillance of 1538 Hoyt Street, saw an individual, later identified as Micah Quinn exiting the residence.  The Prosecutor rested his case.  (T 1-21-2015, p 67-68).

Defense Counsel called Defendant-Appellant, Micah Quinn, who understands his constitutional rights to testify, or to remain silent.  (T 1-21-2015, p 68-69).

Mr. Quinn did not commit this armed robbery, but he did give the statement that was played. He felt pressured to give the statement, and at the time of the statement he was high.  The statement is not accurate rendition of what happened, and is not true.  He was not at the scene of the pizza robbery, and did not stick a gun in Mr. Ferguson's back, or take money, or pizza from him.  He did not lock him

13

in the frunk, and was not in the car when he was driven around. Mr. Quinn did not possess any firearms that night. (T 1-21-2015, p 69-71).

On cross by the Prosecutor, Mr. Quinn knows Taylin Glenn, but they are not good friends. He has only known him for a few months, but he knew of him in 2010 because he was friends with his brother. They became associated in January of 2014. They would see each other about once a week. (T 1-21-2015, p 71-74).

Mr. Quinn was not present for the armed robbery of Brian Scott, although he told the officers that he was. During the interview he was just saying things. He was high on marijuana and narcotics. He told the officers the name of an individual, Kwan. (T 1-21-2015, p 74-76). The Court grants the Prosecutor's request to strike Mr. Quinn's answer when he indicates that the witness at the prelim on the other case said he didn't see the guy's face, there was no knife, and there was only $10 of weed, not an ounce. (T 1-21-2015, p 78).

Mr. Quinn is not denying he made the statements, he is just saying that the statements are not true. (T 1-21-2015, p 82). Mr. Quinn does not deny that he was picked up outside of 1538 Hoyt. He does not deny writing the apology letter to "Mr. Pizza Man". He denies that the letter makes sense because this all happened a block away from his mother's house. Mr. Quinn was only 17 years old and his mother is not about to let him know hungry. The robbery happened on the nineteenth, and they get their food stamps on the fifteenth, so the house was full of food. He does stay at his girlfriend's house sometimes, but he does not stay at Tay's. When he told the police that he had handled one of the guns, that was true. (T 1-21-2015, p 82-85).

Mr. Quinn denies having a conversation with his mother where they were passing notes back and forth, and he does not recall a conversation where he was telling his mother to follow his plan. The Court grants a brief recess for the Prosecutor to find the call. (T 1-21-2015, p 87).

Apparently outside the presence of the jury, the Prosecutor questions Mr. Quinn using a police report involving himself and Taylin Glenn in 2010. He acknowledges that they were "somewhat" friends in 2010. He does not recall making the prior statement. He's not denying it because he's looking at it. The Court rules that it will allow the Prosecutor to go into that to show he was friends with Taylin in 2010. (T 1-21-2015, p 88-92).

The jury is brought back in, and Mr. Quinn acknowledges that he knew Taylin Glenn in 2010, and they were friends. (T 1-21-2015, p 93-95). On redirect, Mr. Quinn forgot that he was friends with Taylin Glenn in 2010 when they were 12 years old. (T 1-21-2015, p 96). Defense Counsel rests. (T 1-21-2015, p 91).

The Prosecutor recalls **Kory Luker**, who was present with Detective Broterenbrood and Defendant when Mr. Quinn's statement was taken. Mr. Quinn did not appear to be under the influence of narcotics. (T 1-21-2015, p 97-99). On cross, the witness acknowledges that narcotics don't always put people to sleep, and the will show up at different times for different people. He has no direct experience regarding delayed effects of narcotics. (T 1-21-2015, p 99-100).

The Prosecutor had closing argument and rebuttal. (T 1-21-2015, p 101-118; 125-133). Defense Counsel had closing argument, asserting that Mr. Furgeson only saw the robber for a few seconds, then saw in the paper that Mr. Quinn had been arrested, prior to identifying him in Court. There was no physical evidence tying Mr. Quinn to the case. There was the statement taken from a 17 year old boy. He argued that the evidence did not amount to proof beyond a reasonable doubt. (T 1-21-2015, p 119-125).

The Court instructed the jury. During the instruction, the Court invited one of the jurors to move closer to make sure he could hear. An alternate is selected and excused. The court officer is sworn, and the jury is sent to deliberate. (T 1-21-2015, p 133-150).

The jury found Mr. Quinn guilty of all four counts, as charged. (T 1-21-2015, p 151-152).

At the February 23, 2015 Sentencing before Judge Marietti, Defendant-Appellant is present with counsel, Mr. Lesica. Mr. Lesica had no changes to the presentence report, and asked the Court to consider the letters in the file. He noted that Mr. Quinn was only 18, and asked the Court to sentence him to no higher than the middle of the guidelines. (T 2-23-2015, p 2).

The Prosecutor had some objections to the guidelines. The Court agreed with the Prosecutor to score OV 10 at 15 points. (T 2-23-2015, p 2-4). The Court denied the Prosecutor's request to score OV 14 at 10 points. (T 2-23-2015, p 4). The Prosecutor wanted OV 16 scored at five points, and the Court agreed. (T 2-23-2015, p 5-6).

Mr. Quinn was allowed to address the Court, and stated that the victim's testimony at trial was flawed. The victim did not give the police a description of Mr. Quinn, then admitted to seeing the pictures in the paper. He also testified that the codefendant, Taylin Glenn was much darker then Mr. Quinn, and Mr. Quinn asserts that he is much darker than Mr. Glenn. He feels his conviction is unjust. (T 2-23-2015, p 7-8). The prosecutor requested the court to sentence Mr. Quinn to 23 years plus two years. (T 2-23-2015, p 11). The Court allowed Mr. Quinn a second opportunity to speak. Claimed that he was walking out of L and G's, the corner store, at the time this happened. There was no forensic evidence that tied into the crime. Mr. Ferguson was unsure about some of the details at the prelim, but he is certain once he gets to trial. (T 2-23-2015, p 13-14).

The Court was determined to sentence Mr. Quinn to the same sentences the codefendant received, 21 to 40 years on count one, and 10 to 15 years on count two, to run concurrent, and consecutive to 2 years for counts three and four, which are con current to each other, with credit for 333 days; $68 state minimum fee for each count, $130 crime victims fee, $8,545 restitution. The Petitioner's rights were given. (T 2-23-2015, p 14-16).

**16**

## STANDARD OF REVIEW

28 USC §2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v Taylor 529 US 362, 405-06; 120 SC 1495 (2000)*. An unreasonable application occurs when a state court decision unreasonably applies the law of the Supreme Court to the facts of a prisoner's case. Id. at 409. A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Id. at 410-11.

The Supreme Court has explained that a federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. *Miller-El v Cockrell 537 US 322, 340; 123 SC 1029 (2003)*. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and 'demands that state-court decisions be given the benefit of the doubt. *Renico v Lett 559 US 766, 773; 130 SC 1855 (2010)*(quoting *Lindh v Murphy 521 US 320, 333, n. 7; 117 SC 2059 (1997); Woodford v Visciotti 537 US 19, 24; 123 SC 357 (2002)(per curiam)*. A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair minded

17

jurists could disagree on the correctness of the state court's decision. *Harrington v Richter 562 US 86, 101; 131 SC 770 (2011)(citing Yarborough v Alvarado 541 US 652, 664; 124 SC 2140 (2004)*. The Supreme Court has emphasized that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. Id. at 102 (citing *Lockyer v Andrade 538 US 63, 75; 123 SC 1166 (2003)*. Furthermore, pursuant to § 2254(d) a habeas court must determine what arguments or theories supported or could have supported the state court's decision and then it must ask whether it is possible fair minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. Id. Habeas relief is not appropriate unless each ground which supported the state court's decision is examined and found to be unreasonable under the AEDPA. See *Wetzel v Lambert 565 US 520; 132 SC 1195, 1199 (2012)*.

If this standard is difficult to meet that is because it was meant to be. *Harrington* 562 US at 102. Although 28 USC §2254(d), as amended by the AEDPA does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts it preserves the authority for a federal court to grant habeas relief only in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. Id. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. Id. at 102-03 (citing *Jackson v Virginia 443 US 307, 332, n. 5; 99 SC 2781 (1979)*(Stevens, J., concurring in judgment). Thus, a readiness to attribute error to a state court is inconsistent with the presumption that state courts know and follow the law. *Woodford* 537 US at 24. In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement. *Harrington* 562 US at 103. In reviewing petitioner's claims, this Court must remember that under the federal constitution, petitioner was entitled

**18**

to a fair trial but not a perfect one.  *Lutwak v United States 344 US 604, 619; 73 SC 481 (1953)*.  In this petition the Petitioner would argue that his jury trial was neither fair nor perfect.

**FEDERALIZATION**

A petitioner fairly presents his claim to the state courts by citing a provision of the constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns.  *Franklin v Rose 811 F2d 322, 326 (6th Cir 1987)*.  The ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim even without citing chapter and verse of the constitution includes: (**a**) reliance on pertinent federal cases employing constitutional analysis, (**b**) reliance on state cases employing constitutional analysis in like fact situations, (**c**) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (**d**) allegation of a pattern of facts well within the mainstream of constitutional litigation.

**ACTUAL INNOCENCE ANALYSIS**

A plea of actual innocence can overcome many federal limitations regarding the significance of a convincing actual-innocence claim.  The United States Supreme Court stated that we have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.  *Herrera v Collins 506 US 390, 404-405; 113 SC 853 (1993)*.  The Supreme Court stated however, that we have recognized that a prisoner otherwise subject to defenses of abusive or successive use of the writ of habeas corpus may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. Id. at 404, 113 SC 853 (citing *Sawyer v Whitley 505 US 333; 112 SC 2514 (1992)* see also *Murray v Carrier 477 US 478, 496; 106 SC 2639 (1986)*(we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default).  In other words, a credible showing of actual innocence

may allow a prisoner to pursue his constitutional claims (here, on the claim raised in this petition) on the merits notwithstanding the existence of a procedural bar to relief. This rule or fundamental miscarriage of justice exception is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons. *Herrera* 506 US at 404. The United States Supreme Court has applied the miscarriage of justice exception to overcome various defaults, these include, successive petitions asserting previously rejected claims, see *Kuhlmann v Wilson 477 US 436, 454; 106 SC 2616 (1986)*; abusive petitions asserting in a second petition claims that could have been raised in a first petition, see *McCleskey v Zant 499 US 467, 494-495; 111 SC 1454 (1991)*; failure to develop facts in state court, see *Keeney v Tamayo-Reyes 504 US 1, 11-12; 112 SC 1715 (1992)*; and failure to observe state procedural rules including filing deadlines, see *Coleman v Thompson 501 US 722, 750; 111 SC 2546 (1991)*; *Carrier* 477 US at 495-496. The miscarriage of justice exception, our decisions bear out, survived AEDPA's passage. In *Calderon v Thompson 523 US 538; 118 SC 1489 (1998)* applied the exception to hold that a federal court may consistent with AEDPA recall its mandate in order to revisit the merits of a decision. Id. at 523 US 558 (The miscarriage of justice standard is altogether consistent with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence). In *Bousley v United States 523 US 614, 622 118 SC 1604 (1998)* the court that an actual innocence claim may even overcome a prisoner's failure to raise a constitutional objection on direct review. In *House v Bell 547 US 518; 126 SC 2064 (2006)* the court reiterated that a prisoner's proof of actual innocence may provide a gateway for federal habeas review of a procedurally defaulted claim of constitutional error. Id. 547 US at 537-538.

## GROUNDS FOR GRANTING RELIEF

### GROUND ONE

THE PETITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BY PETITIONER'S IDENTIFICATION  BY THE COMPLAINING WITNESS COURT AFTER THE COMPLAINT VIEWED MR. QUINN'S PICTURE IN THE PAPER IDENTIFYING HIM AS A PERSON ARRESTED IN CONNECTION WITH THIS CASE.

The Defendant Micah Ishone Quinn asserts that he was denied Due Process and a fair trial by his in court identification by the complaining witness, after the complainant viewed Mr. Quinn's picture in the paper, identifying him as a person arrested in connection with this case.  The identification was further tainted by the officer in charge informing the complainant that two people had been arrested in connection with his case, and both had confessed, prior to the preliminary hearing.   US Const. Amendment V; Mich. Const. of 1963 Art-1 §17.  This issue was not decided by the Trial Court, so a Motion to Remand is filed herewith.

**STANDARD OF REVIEW**

The de novo standard is applied in construing Constitutional provisions, court rules, and statutes. *People v Houstina 216 Mich App 70, 73 (1996).*

**LEGAL SYNOPSIS**

The Defendant Micah Ishone Quinn asserts that he was denied Due Process and a fair trial when the complainant was allowed to identify him at the preliminary hearing, and at trial, after viewing Mr. Quinn's photograph in a newspaper article, which indicated he had been arrested for this offense. The identification was further tainted when the OIC told the complainant that two people had been arrested for the offenses against him, and that both of them had confessed. The first time the complainant was asked to identify Mr. Quinn was during his testimony art the preliminary hearing, and the second time was at trial.

> When a witness has been exposed to an impermissibly suggestive identification procedure, the in-court identification of the defendant will not be allowed unless the prosecutor shows by clear

and convincing evidence that the in-court identification has been based upon a sufficient independent basis so as to purge the taint caused by the illegal confrontation. *People v Kachar 400 Mich 78, 95-97 (1977)*. The factors to be considered when determining whether the in-court identification has an independent basis are listed in <u>*Kachar*</u> at pages 95-96.

*People v Anderson 166 Mich App 455, 421 (1988)*.

The defendant did not object to the out-of-court identification below. This does not preclude this Court from reviewing an alleged violation of constitutional rights. *People v Limon 4 Mich App 440 (1966)*. Defendant argues the out-of-court photo identification was unduly suggestive. The test for setting aside a photographic identification is found in Simmons v United States, supra: We hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Assuming, but not deciding, that the identification procedures used in this case were suggestive, an in-court identification is not thereby tainted if there is an independent basis of identification. *United States v Wade* supra; *People v Hutton 21 Mich App 312 (1970)*; *People v Anderson 29 Mich App 578 (1971)*. The test for determining whether the in-court identification has an independent basis is found in *Wong Sun v United States 371 US 471, 488; 83 SC 407, 417 (1963)*: Whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. See *People v Childers 20 Mich App 639, 647 (1969)*.

*People v Martin 37 Mich App 621, 628-629 (1972)*.

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

*Simmons v United States 390 US 377, 383-384; 88 SC 967 (1968)*.

Michigan cases have recognized that under certain circumstances, a one-on-one confrontation between a witness and the accused at a preliminary examination can constitute a suggestive identification procedure. In the *People v Solomon 391 Mich 767 (1974)* the court recognized that a

22

preliminary examination should be considered a pre-trial confrontation within the meaning of *Stovall v Denno 388 US 293; 87 SC 1967 (1967)* that if the identification at the examination is unduly suggestive and conducive to irreparably mistaken identity, admission of an in-court identification at trial, following such a confrontation, violates due process of law.

In the present case, the complainant, Mr. Ferguson, was not subject to suggestive identification procedures in the form of a line up. The suggestive identification procedure was the preliminary exam, coupled with the information provided to him that two people had been arrested and made admission, and with Mr. Quinn's photograph being on the news and in the paper. Defendant-Appellant's photograph appeared in a newspaper article prior to the preliminary hearing.[1]

At the preliminary hearing, Mr. Furgeson testified that he had never seen Mr. Quinn or the codefendant before. (T 4-30-2014, p 13). He saw Mr. Quinn in his peripheral vision by the door, then saw him for 10 to 15 seconds when he put the food on the ground. (T 4-30-2014, p 14-15, 25). He did not look at Mr. Quinn's face after that. (T 4-30-2014, p 16, 25). The color of the gun was the characteristic that stood out in the complainant's mind as an identifying factor. (T 4-30-2014, p 21). Prior to the preliminary hearing, the complainant learned that two men had been arrested and there was a confession. (T 4-30-2014, p 26-27). The complainant offered that he did not have any trouble identifying Mr. Quinn after he saw his picture in the paper and on news reports. (T 4-302014, p 30-31). He knew about the confession prior to seeing the pictures in the paper. (T 4-302014, p 31).

**The Court**: Did you have any trouble identifying this gentleman!

**The Witness**: Not after I seen him again, no.

**The Court**: Okay. Where did you see him again?

**The Witness**: After I seen the photos and the paper.

---

[1]     While the record is unclear as to what article or news cast the complainant saw, as an example please see the following, published about a month prior to the Preliminary hearing in this matter, including information supplied by the Prosecutor's office: http : //www.mlive.corrvnews,'muskegowindex.ssfr2014/03/all_for_20_54-year-old_pizza_d.html.

**The Court**: That's when you saw him in the paper?

**The Witness**: I saw the picture in the paper and I saw the news report. (T 4-30-2014, p 30).

At the prelim, the OIC acknowledged that he informed the complainant that Mr. Quinn had been arrested, and had confessed. (T 4-30-2014, p 49-50).

At trial, Mr. Ferguson explained:

When I first saw the picture, I did not remember exactly how - - there was no particular things really noticeable about his face, so I didn't remember exactly what he looked like, but as soon as I seen the picture and as soon as I seen him in the Court, I recognized him in the Court and I recognized him in the picture, too. (T 1-20-2015, p 111-112).

The knowledge that someone, whose picture he had seen in the paper and on television, had confessed, certainly tainted the in court identification by Mr. Furgeson both at the prelim and at trial. The fact that the OIC did not show him Mr. Quinn's picture should not be determinative of the issue. The news reports were supplied by law enforcement and/or the Prosecutor's office. The OIC did show Mr. Ferguson one six pack that did not contain Mr. Quinn's picture. It should not have been that difficult to present him with another six pack prior to announcing that two people had been arrested and made admissions.

The fact that this was orchestrated in another manner, does not lessen the danger that the witness may make an incorrect identification and that danger was heightened when the police indicated to the witness that they have other evidence that .. the person[s] ... committed the crime. Simmons v United States supra. For the foregoing reasons the Petitioner asserts that he was denied Due Process and a Fair Trial.

## GROUND TWO

THE PETITIONER IS ENTITLED TO A NEW TRIAL AS HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

**STANDARD OF REVIEW**

Whether a defendant received ineffective assistance of counsel is a mixed question of fact and constitutional law. The appellate court reviews the trial court's factual findings for clear error and it's determinations of law de novo. *People v LeBlanc 465 Mich 575, 579 (2002); People v Grant 470 Mich 477, 484-485 (2004).*

**LEGAL SYNOPSIS**

The Defendant asserts that he was *entitled* to effective assistance of counsel. *Powell v Alabama 287 US 45; 53 SC 55 (1932); People v Pickens 446 Mich 298, 359 (1994).* The United States and Michigan Constitution guarantee Defendant-Appellant the right to the assistance of counsel. US Const. Amendments VI and XIV; and Mich. Const. of 1963 Art-1 §20. The right to counsel is a right to the effective assistance of counsel. *United States v Cronic 466 US 648, 104 SC 2039 (1984); People v Pubrat 451 Mich 589, 594 (1996).*

Defendant-Appellant acknowledges that this issue is complicated by his representation by three different counsel during these proceedings. Ultimately, the burden of assuring a fair trial must fall on the counsel who represented him at trial. Two of the three attorneys began trials with Mr. Quinn.

In the *People v Grant 470 Mich 477 (2004)* the Court affirmed Defendant's burden of establishing prejudice in an ineffective assistance of counsel claim:

> To establish prejudice, he must show a reasonable probability that the outcome would have been different but for counsel's errors a reasonable probability need not rise to the level of making it more likely than not that the outcome would have been different. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

See *People v Gran*t ibid 470 Mich at 486 citing *People v Pickens 446 Mich 298, 338 (1994)* and *Strickland v Washington 466 US 668, 693, 694; 104 SC 2052 (1984).*

As argued above and incorporated herein by reference, the Defendant asserts that he was denied Due Process by the identification made by Mr. Ferguson at his preliminary hearing, and at trial. The

identification and the surrounding problems became known during the preliminary hearing. Prior to trial, Trial Counsel should have brought a motion to suppress the identification. This was not done in Mr. Quinn's case.

> Normally, the independence of the in-court identification is made at a hearing out of the jury's presence. The Defendant lost his right to such a hearing by failing to make a timely motion to suppress. *People v Childers 20 Mich App 639 (1969)*.

*People v Martin 37 Mich App 621, 628-629 (1972)*.

Additionally, Mr. Quinn asserts that Trial Counsel should have moved to suppress his confession. Both the United States Constitution Amendment V and Michigan Constitution of 1963 Art-1 §17, prohibit compelled self-incrimination. *People v Elliott 494 Mich 292, 301 n 4 (2013)*. The prosecutor may not use a defendant's exculpatory or inculpatory statements arising from a custodial interrogation unless it demonstrates the application of procedural safeguards to protect the privilege against self-incrimination. *Miranda v Arizona 384 US 436, 444; 86 SC 1602 (1966)*. During his testimony Mr. Quinn mentioned being under the influence of various substances calling into question the voluntariness of his confession. Further, at the time, Mr. Quinn was only 17 years old.

> In determining whether a statement is voluntary the trial court should consider among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*People v Cipriano 431 Mich 315, 334 (1988)*.

Defense Counsel, knew, or should have known, Mr. Quinn had at least two of the factors mitigating against the voluntariness of his confession, he should have moved to suppress the confession prior to trial, and/or requested an evidentiary hearing on the matter. *People v Walker 374 Mich 331 (1965)*. Further, as Defense Counsel pointed out in his cross examination of one of the officers, 17

year old Mr. Quinn was in a small room with two Detectives. During the interrogation, they both moved closer to him, suggesting threatening or coercive behavior.

While Defense Counsel did not move, prior to (or during) trial to suppress either Mr. Ferguson's identification, or Mr. Quinn's statement, he argued that both these areas of evidence were unreliable, to the jury in closing.

> A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make an independent examination of the facts, circumstances, pleadings and laws involved. *Von Moltke v Gillies 332 US 708, 721; 68 SC 316 (1948)*. This includes pursuing all leads relevant to the merits of the case. *Blackburn v Foltz 828 F2d 1177, 1183 (6th Cir 1987)*. We evaluate defense counsel's performance from counsel's perspective at the time of the alleged error and in light of the circumstances. *Strickland*, supra at 689. Thus, counsel's words and actions before and at trial are the most accurate evidence of what his strategies and theories were at trial.

*People v Grant 470 Mich 477, 486-487 (2004)*.

Finally, Mr. Quinn asserts that he asked counsel to ask certain questions during trial, and prior to trial had provided names of alibi witnesses, who were not called at trial. (See Appendix A, Affidavit of the Defendant).

> First, if the alibi is established, a perfect defense has been shown and the defendant should accordingly be acquitted. Alternatively and, perhaps, more importantly, the instruction must clearly indicate that if any reasonable doubt exists as to the presence of the defendant at the scene of the crime then, also, the defendant should be acquitted. *People v Virgil Brown 15 Mich App 600, 605-606 (1969); People v Loudenslager 327 Mich 718, 726 (1950)*.

*People v Erb 48 Mich App 622, 630 (1973)*.

Whether Mr. Quinn received ineffective assistance of counsel may be reviewed without an evidentiary hearing. *People v Cicotte 133 Mich App 630 (1984); People v Johnson 124 Mich App 80, 88 lv den 419 Mich 851 (1983), People v Davis 102 Mich App 403, 410-411 (1980)*. If this Honorable Tribunal believes that an additional record is required the matter should be remanded for a hearing pursuant to *People v Ginther 390 Mich 436, 442 (1973)*.

For all the foregoing reasons, the Petitioner Micah Ishone Quinn asserts that he was denied Due Process and a fair trial, as he was denied effective assistance of counsel requiring a new trial, or in the alterative, an evidentiary hearing on counsel's effectiveness during the Petitioner trial proceedings.

### GROUND THREE

THE PETITIONER IS ENTITLED TO BE RESENTENCED BECAUSE THE FACTS IN SUPPORT OF SOME OF HIS OFFENSE VARIABLE SCORES WERE NOT FOUND BY THE JURY TO BE PROVEN BEYOND A REASONABLE DOUBT, HE WAS SENTENCED PRIOR TO JULY 29, 2015, AND THE SIXTH AMENDMENT VIOLATION ALTERED THE GUIDELINE RANGE.

**STANDARD OF REVIEW**

The denial of the Sixth Amendment right to trial by jury is reviewed de novo. *People v Bryant 491 Mich 575, 595 (2012); People v Stokes 312 Mich App 181 (2015).* We review this preserved claim of constitutional error to determine whether the party benefitting from the error has established that it is harmless beyond a reasonable doubt. *People v Likine 492 Mich 367, 408 (2012); People v Stokes, supra; People v Terrell 312 Mich App 450 (2015).*

**LEGAL SYNOPSIS**

Guidelines scoring errors may be raised at sentencing; in a motion for re-sentencing; or in a motion to remand. See *People v Kimble 470 Mich 305, 310-311 (2004)*; MCLA 769.34(10); MCR 6.429(C). The Defendant is entitled to be sentenced according to accurate information. See *Townsend v Burke 334 US 736; 68 SC 1252 (1948); People v McGraw 484 Mich 120, 131 (2009).*

The Sixth Amendment provides that those accused of a crime have the right to a trial by an impartial jury. This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt. See *United States v Gaudin 515 US 506, 510; 115 SC 2310 (1995); In re Winship 397 US 358, 364; 90 SC 1068 (1970).* The substance and scope of this right depend upon the proper designation of the facts that are elements of the crime.

*Alleyne v United States 570 US 99; 133 SC 2151 (2013); People v Lockridge 498 Mich 358 (2015)*; US Const Amendments V and VI; Mich. Const. of 1963 Art-1 §2.

28

The Defendant asserts that offense variables, OV 3, 4, 7, 10, 13 and 16[2] were scored based on factors not proven to a jury so as to be reflected in their verdict.

OV 3 is governed by MCLA 777.33, and scored for physical injury to a victim. While Mr. Ferguson testified to injuries, an injury is not an element of any of Mr. Quinn's convictions, therefore, this is not reflected in the jury's verdict. The score reflects judicial fact-finding, and violated Mr. Quinn's right to trial by jury. See *People v Lockridge* supra.

OV 4 is governed by MCLA 777.34, and scored for psychological injury to a victim. It can be scored either 10 or 0 depending on whether there was serious psychological injury requiring professional treatment to a victim. There is nothing in the jury's verdict that reflects psychological injury. The Defendant asserts that this score violated his right to trial by jury. See *People v Lockridge* supra.

OV 10 is governed by MCLA 777.40 and is scored for exploitation of a vulnerable victim. As Mr. Quinn's convictions do not contain any element related to a specific type of victim, the score reflects judicial fact-finding, and violated Mr. Quinn's right to trial by jury. See *People v Lockridge* supra.

OV 13 is governed by MCLA 777.43 which involves a pattern of criminal activity and was scored at 55 points at sentencing. The statute provides that OV 13 can be scored for gang involvement , or a pattern of criminal activity involving three or more crimes, with the number of points depending on the nature of the crimes within a five year period. MCLA 777.43(1).

The instant case involves two felonies against a person convictions. Mr. Quinn did have other felonies within five years of the instant conviction but this is not reflected in the jury's verdict. While there is a preponderance of evidence to support this score, it did involve judicial fact-finding, as the

---

[2]    OV 16 is not scored on the corrected SIR, attached to the PSR filed herewith, although the Court agreed to score it a 5 points.  (T 2-23-2015, p 5-6).  This would raise the OV score to 150, which would remain Level VI, as it was at sentencing.

jury's verdict only involved two crimes against a person. See *People v Hardy* and *People v Lockridge* supra.

OV 16 is governed by MCLA 777.46 and is scored for property obtained, damaged, lost or destroyed. At sentencing, this OV was scored at 5, as a result of judicial fact-finding, once again. The jury's verdict does not reflect any value of property. See *People v Lockridge* supra.

While conceding that the Court could find a preponderance of the evidence to score these Offense Variables. The Defendant asserts that the scoring involved judicial fact-finding, as the physical and psychological injury to a victim, exploitation of a certain type of victim, a pattern of criminal behavior, and degree of property damage was not reflected in the jury's verdict. See MCLA 777.33; MCLA 777.34; MCLA 777.40; MCLA 777.43; MCLA 777.46; and *People v Lockridge* supra.

If the scores for all of the OVs which were not reflected in the jury's verdict were corrected, he would be at level II of the Class A Grid, as opposed to level VI used at sentencing. His range would have been 51 to 85 months and not the 171 to 285 months used to impose the 21 year minimum sentence. As set forth in *Lockridge*:

> We conclude that all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry.

The Defendant acknowledges that *Lockridge* provides that the guidelines are now advisory only, and that the court is required to score them, assigning the highest number of points to each offense variable. However, the Defendant has demonstrated that the guideline range in his case was constrained by a violation of the Sixth Amendment and since the court did not depart upward from his guidelines, he has made the required threshold showing of potential for plain error sufficient to warrant a remanded to the trial court for further inquiry on whether the trial court would resentence the Defendant. *People v Lockridge* supra.

**RELIEF SOUGHT**

For the reasons stated herein, this court should grant this petition, or in the alternative, order an

evidentiary hearing to preserve these question for appeal, or grant such other relief as the court deems

just and fair under the circumstances of this case.

**DECLARATION OF SERVICE**

The petitioner certify under 28
USC 1746 that a copy of this
document was served to all
parties by U.S. Mail.

SUBMITTED BY:

MICAH ISHONE QUINN #948357

**DATED**: _6/18/19_____, 2018 2019

31

Mic... ... ... #948357
Alger Correctional Facility
N6141 Industrial Park Drive
Munising, MI 49862

Clerl
U.S.
Western
110 M
Grand



_ of The Court

_District Court

_ District of Michigan

_ichigan N W

_ Rapids, Michigan 49503